**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 10 2014, 9:43 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**KURT A. YOUNG**
Nashville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ELLEN H. MEILAENDER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MICHAEL D. WILLIAMS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A04-1403-CR-137 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Stanley E. Kroh, Commissioner
Cause No. 49G03-1307-FA-48541

**December 10, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Michael D. Williams appeals his convictions for rape as a class A felony, criminal deviate conduct as a class B felony, criminal confinement as a class C felony, and carrying a handgun without a license as a class A misdemeanor. Williams raises two issues which we revise and restate as:

I.      Whether the trial court abused its discretion in excluding certain evidence; and

II.     Whether the evidence is sufficient to sustain his convictions.

We affirm.

FACTS AND PROCEDURAL HISTORY

On April 10, 2012, E.P., who was eighteen years old by February, 10, 2014, left her friend's house around 6:00 p.m. and started walking east along 30th Street in Indianapolis toward her home. At the intersection of 30th Street and Euclid, a "maroon-like" pickup truck stopped at the intersection, and E.P. crossed the street in front of the truck. Transcript at 37. E.P. heard a door close and saw Williams walk up to her. E.P. also observed that Williams had a gun. Williams pointed the gun at E.P. and told her to "get in the truck." Id. at 39. E.P. did not see anyone around and was wondering: "Where is everybody at in broad daylight?" Id. at 40. E.P. entered the passenger side of the truck because she was scared and Williams had a gun. Williams entered the truck, locked the doors, drove to an alley, and stopped in front of a blue and white garage.

Williams then told E.P. to "take [her] stuff out," which E.P. interpreted as pulling her clothes down, and she complied by removing her jacket and pulling down her underwear and pants together. Id. at 49. E.P. saw the gun in Williams's right hand and thought: "How am I going to get out of this?" Id. at 50. Williams then told E.P. to "give

2

him oral," and E.P. complied by placing her mouth on his penis. Id. at 49. E.P. observed that Williams was wearing brown sweatpants with an orange stripe and a paint stain on the side on his right leg. At some point, E.P. grabbed the door handle to the truck, but it was locked and she could not open the door. Williams leaned over the passenger seat and pulled the lever to recline the seat. Williams then climbed on top of E.P. and had vaginal sex with her. At some point, Williams stopped, pushed E.P. out of the truck, threw her belongings out of the truck, and drove away.

E.P. then walked home but did not call anyone because she did not have her phone. E.P. rinsed her mouth with mouthwash and started running bath water because she wanted to "cleanse [herself] of him," but she did not take a bath. Id. at 61. A.P., E.P.'s older sister, asked E.P. what had happened, and E.P. told her. E.P. then told her parents what had happened. E.P. and some members of her family then drove to the location where the offense occurred, and E.P. showed her family the blue and white garage and the alley. They drove around looking for a similar truck, but did not find one. They then went to the hospital.

Indianapolis Metropolitan Police Officer Joel Anderson met E.P., and E.P. told him that the suspect wore brown jogging pants with white lines going down the side and that there was some paint on the right leg. Tamera Lee Williams, a forensic nurse examiner, interviewed and examined E.P. and collected her clothing and other evidence for a sexual assault evidence collection kit. Indianapolis Police Detective Daniel Smith spoke with E.P., and she provided him with the location of the sexual assault including that the offense

occurred by an old white and blue garage. Detective Smith drove to the alley and located the garage. The following day, E.P. provided a formal statement to Detective Smith.

Shannon Guy, a forensic biologist at the Indianapolis Marion County Forensic Services Agency, detected semen on the vaginal / cervical swab, swabs from the external genitalia, the vaginal wash, and E.P.'s underwear. DNA examination of those items resulted in a DNA profile for the sperm, the DNA profile was uploaded into the Indiana DNA database, and the DNA database returned a match to Williams.

Detective Smith went to the address of Williams's mother who told him that Williams was currently living with his wife. Williams's mother indicated that Williams had two brothers, neither of which was an identical twin. Detective Smith told Williams's mother that he needed to speak with Williams and left his card and telephone number.

Shortly after midnight, Williams called Detective Smith. Detective Smith interviewed Williams the next morning. Williams denied having sex outside of marriage and repeatedly told Detective Smith that he had the wrong guy and that he drove a black pickup within the last couple of years. Detective Smith obtained a search warrant for Williams's address, executed the warrant, and found a pair of brown jogging pants.

On July 24, 2013, Detective Smith showed E.P. a photo array containing Williams's photo. E.P. studied the photo array, placed her finger on Williams's photo, and told Detective Smith that the photo looked like the person but that she did not want to blame the wrong person.

On July 29, 2013, the State charged Williams with Count I, rape as a class A felony; Count II, criminal deviate conduct as a class A felony; Count III, criminal confinement as

4

a class B felony; Count IV, criminal confinement as a class B felony; Count V, unlawful possession of a firearm by a serious violent felon as a class B felony; and Count VI, carrying a handgun without a license as a class A misdemeanor.4 The State also filed "Part II of Count VI" charging Williams with carrying a handgun without a license as a class C felony. Appellant's Appendix at 43. The State subsequently added an allegation that Williams was an habitual offender.

On February 10, 2014, a jury trial was commenced. E.P., A.P., E.P.'s father, Officer Anderson, Nurse Williams, and others testified to the foregoing. A.P. testified that E.P. ran quickly in the house, went directly to her parents' room to see if they were home, and started running bath water. A.P. also testified that E.P. was hurt, that she did not let E.P. enter the bathtub because "something was wrong," and that E.P. started crying even harder when she asked her if someone raped her. Transcript at 125. After a question from the jury, A.P. testified that E.P. did not actually tell her that she was raped "[b]ut you can tell that she was because of how she looked and the way she had reacted when I had said it." Id. at 138.

E.P. testified on cross-examination that she recalled telling the detective that Williams told her to "give him some head" and that during a meeting at the office of Williams's counsel, she "went straight from pull my jeans to he got on top of me and had sex." Id. at 87. The following exchange then occurred:

[Defense Counsel]   Do you remember why you left out –

[E.P.]                Because, I mean, I didn't recall everything, for one.

[Prosecutor]:         I would object, Your Honor.

5

[Defense Counsel]:   I – I –

[Prosecutor]:   Can we approach, please?

COUNSEL APPROACHED THE BENCH

[Prosecutor]:   If [Defense Counsel] can point to a place in a deposition where she asked her a question about that.

THE COURT:   I'm sorry.  Your witness.

[Prosecutor]:   There was not a question about that specifically in the deposition.  So if I said, you know, he said give me some head or whatever, and then I said what happened next – that's how I questioned her on direct today.  Those were not the same questions that were asked at the deposition.  So it's not a fair impeachment.  It's not like she was asked the same questions.

[Defense Counsel]:   Well, except she didn't – she – because in the deposition it was being more – it was more narrative.  It was like, well, tell me what happened, what did he say, what happened next.  I did ask that.  I didn't ask just specifically did – you know, but I told her to tell me in order what happened, and she left that completely out.

THE COURT:   Okay.

[Prosecutor]:   I just – I don't think it's proper impeachment, which –

[Defense Counsel]:   Well, proper or not, she admitted that she left it out, so . . . .

* * * * *

[Prosecutor]:   We ask that it be stricken from the record.  She's acting like that's –

THE COURT:   I'm sorry.  What?

[Prosecutor]:   I'm sorry.  We're asking that the last response be stricken from the record and –

THE COURT:   I'm not even sure the last response was not okay.

6

[Prosecutor]:          Well, it's –

THE COURT:          I haven't ruled on it.

[Prosecutor]:          All right. And so my position on that is that [Defense Counsel] was never – she was never given a prior statement about a specific issue. Therefore, she cannot be provided an opportunity to explain or deny said statement, which means impeachment by cross-examination may not continue after that point.

THE COURT:          I'm going to have to see statements in order to find out –

* * * * *

THE COURT:          Okay. So the objection is that she's being asked about something here today that was never asked in the statement.

[Prosecutor]:          Right. It's improper impeachment because the Defense has not provided proof she said an inconsistent statement.

[Defense Counsel]: For my argument –

THE COURT:          Okay. Sustained.

[Defense Counsel]: Judge, if I can complete my argument.

THE COURT:          Excuse me?

[Defense Counsel]: I asked exactly the same as they did: What happened next? So it was asked.

THE COURT:          You know, this really could be resolved with redirect and recross. Let's just cross.

COUNSEL RETURNED TO COUNSEL TABLES

Id. at 87-91.

7

Williams testified that he initially told Detective Smith that he did not have sexual contact with anyone else other than his wife. Williams also testified that he did not recognize E.P. Williams stated that he was driving a black Dodge Ram pickup truck on 30th Street, he made eye contact with E.P., he pulled over, she jumped in, and that "it was going to be cash trade for sex." Id. at 406. Williams testified that he gave her twenty dollars, that she wanted more, and that he said it was "good enough." Id. at 407. He stated that she gave him oral sex in the vehicle, that he climbed on top of her, and that his penis made contact with her vagina or at least the outer part of her vagina. He also testified that "[s]he was upset that she wanted more money." Id. at 411. He also testified that he earlier stated that he never had a maroon truck or knew anybody with a maroon truck, but that his aunt drives a maroon truck. He testified that he gave inaccurate information to Detective Smith.

The jury found Williams guilty of Counts I, II, III, IV, and VI.[1] Williams then stipulated that he was an habitual offender. The State moved to dismiss Count V, possession of a firearm by a serious violent felon as a class B felony, and the charge of carrying a handgun without a license as a class C felony. Due to double jeopardy concerns, the court vacated the conviction for Count III and entered judgment of conviction of criminal deviate conduct as a class B felony on Count II and criminal confinement as a class C felony on Count IV. On February 28, 2014, the court sentenced Williams to thirty

---

[1] The State charged Count V as unlawful possession of a firearm by a serious violent felon as a class B felony and Count VI as carrying a handgun without a license as a class A misdemeanor. For purposes of trial, Count VI was classified as Count V, and the jury found Williams guilty of carrying a handgun without a license as a class A misdemeanor "as charged in Count V." Transcript at 539.

years on Count I, sixteen years on Count II, six years on Count IV, and one year on Count VI. The court ordered that Williams's sentence for Count I be enhanced by thirty years for a total sentence of sixty years for Count I. The court ordered that the sentences be served concurrent to each other.

## DISCUSSION

### I.

The first issue is whether the trial court abused its discretion in excluding the evidence that E.P. omitted that she performed oral sex while recounting the incident during a deposition. The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for an abuse of discretion. Wilson v. State, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." Smith v. State, 754 N.E.2d 502, 504 (Ind. 2001). Even when a trial court errs in excluding evidence, we will not find reversible error where that error is harmless; that is, where the error did not affect the substantial rights of a party. See Ind. Trial Rule 61.

Williams contends that the trial court abused its discretion in sustaining the State's objection to his cross-examination of E.P. regarding her omission of the incident of oral sex when asked to relate what happened in a deposition. He argues that the State's objection that it was improper impeachment because the defense had not provided proof she made an inconsistent statement "entirely misses the point: [E.P.] was being cross-examined about a prior statement – the deposition – in which she gave a version of events that was inconsistent with her testimony at trial." Appellant's Brief at 19. He asserts that

9

the restriction of cross-examination that might otherwise tend to show the alleged victim fabricated a version of events different than that testified to at trial prejudiced him.

The State argues that Williams waived this issue because he has not provided a record adequate to allow for a full and sufficient review of the issue because E.P.'s deposition was not a part of the record or provided to this court. The State asserts, waiver notwithstanding, that the court properly sustained the prosecutor's objection. The State contends that this was not a case where E.P. denied that any oral sex occurred during her deposition or said affirmatively that the only sex act that occurred was the intercourse. The State alleges that E.P. simply did not say anything about the oral sex, and it appears that this was because she was never asked anything about it by defense counsel during the deposition, unlike the trial where the prosecutor did ask questions to elicit that testimony. The State also claims that Williams would have been aware that the claim of compelled oral sex existed at the time of the deposition. Lastly, the State asserts that any error would be harmless.

Ind. Evidence Rule 613(b) provides:

Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires. This subdivision (b) does not apply to an opposing party's statement under Rule 801(d)(2).

Initially, we observe that the record does not include a copy of E.P.'s deposition and no offer of proof containing the deposition was made. Thus, we cannot determine exactly what question was asked of E.P. during her deposition and cannot compare her trial testimony with her statements at the deposition to determine whether an inconsistency

10

exists. We also note that E.P.'s testimony illustrating any inconsistency was before the jury. Specifically, E.P. testified that she recalled telling the detective that Williams told her to "give him some head" and that during a meeting at the office of Williams's counsel, she "went straight from pull my jeans to he got on top of me and had sex." Transcript at 87. Williams's counsel then essentially asked E.P. if she remembered why she did not mention that she performed oral sex on Williams at the deposition, and E.P. testified before the jury: "Because, I mean, I didn't recall everything, for one." Id. Only then did the prosecutor object. During a conference at the bench, the prosecutor moved to strike E.P.'s last answer. The court sustained the prosecutor's objection but did not explicitly rule on the prosecutor's request to strike E.P.'s last answer and did not inform the jury that E.P.'s last answer should not be considered. Rather, the court concluded the bench conference by stating: "You know, this really could be resolved with redirect and recross. Let's just cross." Id. at 90-91. Thus, E.P.'s testimony regarding any possible inconsistency was before the jury. See Johnson v. State, 257 Ind. 682, 686, 278 N.E.2d 577, 580 (1972) ("If there was no opportunity to object before the objectionable matter came into evidence, the remedy is by way of a motion to strike."). Based upon the record, we cannot say that the trial court abused its discretion or that Williams was prejudiced by the trial court's ruling. See Gray v. State, 982 N.E.2d 434, 438 (Ind. Ct. App. 2013) (holding that any error in excluding playing the relevant portions of a tape was harmless where the police officer ultimately admitted that his testimony may have been inconsistent).

11

The next issue is whether the evidence is sufficient to sustain Williams's convictions. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. Jordan v. State, 656 N.E.2d 816, 817 (Ind. 1995), reh'g denied. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. Id. We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. Id.

Williams asserts that the sole issue was whether it was a "sex for cash transaction, and therefore was consensual, as testified to by Williams, or whether the sexual activity and her getting into Williams'[s] truck was compelled by the threat of force - the gun." Appellant's Brief at 15. He contends that "[p]articularly striking was her forgetting to mention oral sex during the deposition, and her admission at trial that a gun was not held at her face when Williams was on top of her." Id. at 16. Williams argues that E.P.'s testimony is incredibly dubious and points to conflicting statements between E.P.'s testimony at trial, her original statement to police, and her statements in a deposition. The State argues that Williams's argument is nothing more than a request to reweigh the evidence and disbelieve the victim's testimony.

The incredible dubiosity rule applies only in very narrow circumstances. See Love v. State, 761 N.E.2d 806, 810 (Ind. 2002). The rule is expressed as follows:

> If a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence, a defendant's conviction may be reversed. This is appropriate only where the court has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated

testimony of incredible dubiosity. Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it.

Id.

To the extent that Williams points to inconsistencies between E.P.'s testimony at trial and previous statements, such as E.P. stating in her original statement to police that Williams simply pulled his penis from the front of his pants but at trial testified that he pulled his pants all the way down, we observe that conflicts in pretrial statements and trial testimony do not make a witness's trial testimony incredibly dubious. See Murray v. State, 761 N.E.2d 406, 409 (Ind. 2002). We also observe that these inconsistencies were addressed during cross-examination and were in front of the jury. Further, during redirect examination, E.P. indicated that her statement to Detective Smith occurred "pretty much right after this happened" and that her deposition occurred sometime at the end of 2013 or a year and one-half after the offense. Transcript at 108.

In addition, we note that E.P.'s testimony was not wholly uncorroborated and there was not a complete lack of circumstantial evidence in this case. We cannot say that the testimony of E.P. was so inherently improbable that no reasonable person could believe it. Williams fails to point to any specific testimony of E.P. showing that her testimony was somehow inherently inconsistent and has not shown that E.P.'s testimony was incredibly dubious.

To the extent E.P.'s testimony conflicts with Williams's testimony, the function of weighing witness credibility lies with the jury as trier of fact, and the jury could determine whose testimony was believable. See Whited v. State, 645 N.E.2d 1138, 1141 (Ind. Ct.

13

App. 1995) (holding that the function of weighing witness credibility lies with the trier of fact, not this court).  Based upon our review of the evidence and testimony most favorable to the conviction as set forth in the record and above, we conclude that sufficient evidence exists from which the trier of fact could find Williams guilty beyond a reasonable doubt.

## CONCLUSION

For the foregoing reasons, we affirm Williams's convictions.

Affirmed.

BARNES, J., and BRADFORD, J., concur.